## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| **MIGUEL GUERRERO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No.** |
| **TRANS UNION, LLC,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff, MIGUEL GUERRERO (hereinafter "Plaintiff"), by and through the undersigned counsel, alleges the following against Defendant, TRANS UNION, LLC LLC (hereafter "Trans Union" also known as a "CRA"), and in support thereof respectfully alleges violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

### PRELIMINARY STATEMENT

1.     This is an action for actual damages, statutory damages, punitive damages, costs, and attorney's fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA").

2.     In this case, Trams Union has combined or mixed Plaintiff's credit file with another consumer, which has resulted in the publication of inaccurate information including personal identifying information, collection accounts and credit accounts that do not belong to him.  Despite multiple requests for reinvestigation and correction by Plaintiff, Trans Union has failed to reasonably investigate the Plaintiff's disputes and has continued to inaccurately report that he had multiple serious delinquencies on his credit report.  Plaintiff has alerted Trans Union

that it appeared that his credit file had been mixed with his twin brother.  This continues to be a major problem with many consumers as a result of Trans Union's matching procedures.

3.     The FCRA demands reporting agencies like Trans Union utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). In addition, when a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.     Consumer Reporting Agencies ("CRAs") that create consumer reports, like Trans Union are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report.

5.     Plaintiff brings claims under § 1681e(b) against Experian because it reported the inaccurate information regarding accounts that did not belong to him, Capital One Bank, USA, N.A., CB/Indigo GF, Citicards-CBNA, Credit One Bank, Macy's DSNB, Santander Consumer USA, Credit Collection Service, and Security Credit Service. When Plaintiff disputed the inaccuracies, Trans Union did not reasonably investigate, also violating § 1681i.

6.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how these Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Both Defendants have been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

JURISDICTION AND VENUE

7.      This Court has jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1367.

8.      Venue is proper in this District as Plaintiff is a resident in this District, the violations described in this Complaint occurred in this District, and Trans Union transacts business within this District.

**PARTIES**

9.      Miguel Guerrero is a natural person who resides in Baltimore, Maryland.  He is a "consumer" as defined in 15 U.S.C. §1681a(c).

10.     Trans Union is a foreign corporation headquartered in the State of Illinois, authorized to conduct business in the State of Maryland through its registered agent, CSC Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

11.     Trans Union is a "consumer reporting agency," as defined in 15 USC § 1681(f). It is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d), to third parties.

12.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

**FACTUAL ALLEGATIONS**

***Sections 1681e(B) and 1681i(A) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendants' Creditor-Customers***

13.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate

3

information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

14.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

15.     Section 1681i(a) on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through her dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

16.     Section §1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.* 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation'

is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc*., 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

17.     It has long been the law that a CRA, such as Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

18.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir. 1997).

19.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

20.     Further, as Trans Union is aware, it is generally accepted that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendant has a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)].
For example, Section 1681e(b) requires (1) "reasonable procedures" that (2)
"assure" (3) "maximum possible accuracy." To "assure" means "to make sure or
certain: put beyond all doubt." *Webster's Third New International Dictionary* 133
(1993). "Maximum" means the "greatest in quantity or highest degree attainable"
and "possible" means something "falling within the bounds of what may be done,
occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how
"maximum possible accuracy" could be guaranteed without an adequate
investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation,"
necessarily implying that an "investigation" was required to have been performed
in the first instance.

*Burke*, 2011 WL 1085874, at *4.

21.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that
may indicate systematic problems (by virtue of information from consumers, report
users, from periodic review of its reporting system, or otherwise), it must review
its procedures for assuring accuracy and take any necessary steps to avoid future
problems. Similarly, it should establish procedures to avoid reporting information
from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011),

at 67.[1]

### *Plaintiff Discovers Trans Union is Reporting Accounts that Did not belong to Him*

22.    In late 2020, Plaintiff tried to obtain a mortgage to buy a home for his family.

23.    When Plaintiff checked his credit reports, he learned that Trans Union was
reporting derogatory and inaccurate credit information about him.

24.    The derogatory and inaccurate information included information that belonged to
Plaintiff's twin brother, Carlos Guerrero, even though Carlos has a different name, social security
number, and address history from Plaintiff.

---

[1]  Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–
fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

25.     The inaccurate information reported by Defendant, including several charge offs for Carlos Guerrero's accounts, which negatively reflected upon Plaintiff's financial responsibility, creditworthiness and his reputation.

### *Plaintiff disputes the Inaccurate Information with Trans Union*

26.     In late January, Mr. Guerrero sent via certified mail a detailed dispute letter to Trans Union regarding its mixing of information belonging to his brother into his credit file.

> I am writing to dispute information you have reported on my credit report. I have a twin brother, Carlos Guerrero, and you are reporting his information as mine. My name is Miguel Guerrero, my birthdate is x/xx/xx, and my social security number is xxx-xx-xxxx.  Carlos' birthdate is also x/xx/xx, but his name is different from mine and his social security number ends with xxxx..

> The following information belongs to Carlos and I request that you remove it from my credit report:

> - The third and fifth addresses you have reported belong to Carlos
> - The last phone number on the first line, and the last two on the second line, belong to Carlos
> - The Capital One Bank USA, NA account with a credit limit of $4,100 belongs to Carlos
> - The CB Indigo account belongs to Carlos
> - The Citicards-CBNA accounts belongs to Carlos
> - The Credit One Bank account belongs to Carlos
> - The DSNB/Macy's account belongs to Carlos
> - The Santander Consumer USA account belongs to Carlos
> - The Credit Collection Servic account belongs to Carlos
> - The Security Credit Services account belong to Carlos
> - All of the Regular Inquiries belong to Carlos
> - Ally Financial listed under Checking Account and Demand Deposit Account(DDA) Activity belongs to Carlos

27.     Trans Union never attempted to contact the Plaintiff about his disputes.  Trans Union ignored the Plaintiff's dispute and never provided him the results of his dispute.

### *Trans Union Does Not and Do Not*
### *Conduct Any Investigation of Most Consumer Disputes*

28.     Unknown to the Plaintiff until this action, it has long been the practice of Trans Union to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. That vendor, previously known as Intelenet Global Services, is now as Teleperformance.

29.     The Dispute Processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a dropdown menu and then click that code.

30.     In fact, Trans Union (all CRAs, really) strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into an electronic-communication system called e-Oscar without ever touching human hands or being read by human eyes at TransUnion. It gets sent to Trans Union's creditor customer for its sole consideration.

31.     Here is how it the written mail dispute process actually works: Trans Union receives and scans mailed disputes like Plaintiff's into batches directly out of its facility in Eastern Pennsylvania.

32.     Trans Union then forwards the dispute mail batches to  Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from Trans Union, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/hers."

33.     Teleperformance agents are not allowed to do any of these things:  contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; take longer than 5 minutes per dispute.

34.     Trans Union and non-party Equifax, another Teleperformance customer, have both taken the position in other litigation that they have no control over Teleperformance or its employees. For example, under oath before another Florida Court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax."  Miller v. Equifax Info. Serv., No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "[c]ourts have determined that Intelenet is a separate legal entity, not controlled by a party."

35.     TransUnion has taken and succeeded with this same position.  See, e,g., *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.) (ECF 71) (ruling that Trans Union did not have control or the ability to produce Indian employees of Intelenet).

36.     Regardless of whether these statements are correct, Trans Union believes that it cannot direct, control, manage or reliably influence the employees of its third-party Indian outsource vendor.

37.     Trans Union itself did not conduct any reinvestigation of Plaintiff's many disputes. Instead, it merely caused them to be removed from Trans Union's control to be saved within a database by an overseas data processing vendor.

38.    Plaintiff obtained a copy of his Trans Union consumer report from www.annualcreditreport.com in the middle of March.  Plaintiff noticed that Trans Union had removed one of his brother's addresses and phone numbers.

39.    Trans Union had failed to remove from Plaintiff's consumer reports the mixed accounts – Capital One Bank, USA, NA, Citicards-CBNA, DSNB/Macy's, Santander Consumer USA, and Ally Financial.

40.    Trans Union also did not remove the Credit Collection Service and Security Credit Services accounts, but it did note that the "account was disputed by consumer."

### *Plaintiff Suffered Actual Damages*

41.    Plaintiff continues to suffer as of the filing of this Complaint with Trans Union's reluctance to do any independent investigation about the accounts that have been mixed into his credit report.

42.    Plaintiff has been attempting to resolve these matters with Defendant and his credit was significantly destroyed by Defendant's failure to correct the inaccurate reporting.

43.    As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

      a.  Stress associated with multiple denials for car leases, personal loans, credit cards, and delays in applying for future lines of credit;

      b.  Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

      c.  Loss of time attempting to cure the error;

      d.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

44.     Stress associated with attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

45.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

46.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff" and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.,* 526 F.3d 142, 151 (4th Cir. 2008).

47.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  Defendant's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendant's "grave responsibilities" to ensure accuracy has not changed.

48.     Trans Union has received many thousands of disputes and other complaints regarding the creditors at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

49.     Just in federal court alone, during the last decade the creditor-furnishers disputed by Plaintiff have had to defend collectively hundreds of consumer lawsuits.

50.     In many, or even most, of these FCRA lawsuits brought by a consumer. Experian was a named co-defendant.

51.     Experian knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

52.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

53.     Trans Union regularly receives unredacted consumer dispute details from this database.

54.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

55.     Further, just shy of 38,000 of the CFPB complaints against Trans Union were based largely on its failure to reasonably investigate consumer disputes.

56.     Just in the last 12 months alone, Trans Union has been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

57.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendant on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Trans Union on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

58.     TransUnion has long been on notice.  The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a

consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case.

*Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Trans Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

59.     Defendant has also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

60.     In 2015, a large group of state Attorneys General forced a consent order from the Defendant by which they were required to develop procedures necessary to comply with the FCRA.[2]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

61.     The AG Settlement also required the Defendants to conduct significant research and data gathering – even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

62.     Trans Union is also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading egal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a

---

[2]     Available    at    https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

consumer makes a dispute. That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

63.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

64.     Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

---

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

65.     Despite the notice and judicial, regulatory, and public-interest criticism, Defendant has refused to change its dispute investigation process because it would cost too much money to do so.

66.     Trans Union's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of FCRA § 1681e(b)**

67.     Plaintiff re-alleges and fully incorporates each of the above paragraphs as if fully stated herein.

68.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff.

69.     As a result of this conduct, action and inaction of Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

70.     Further, after the Plaintiff's detailed disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, TransUnion ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

71.     Trans Union furnished multiple consumer reports to third parties containing the inaccurate tradeline information and Trans Union did so after receiving notice of these inaccuracies.

72.     Trans Union's conduct, action, and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Trans Union was negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o. Trans Union failed to properly conduct any independent investigation regarding the erroneous reporting.

73.     As a result of Trans Union's violations of 15 U.S.C. § 1681e(b), Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

74.     The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

WHEREFORE, Plaintiff respectfully demands a trial by jury on all issues so triable and judgment against Defendant, TRANS UNION LLC, for statutory damages, punitive damages, actual damages, costs, interest, attorney fees, enjoinder from further violations of these parts and any other such relief the Court may deem just and proper.

## COUNT II
## Violation of FCRA § 1681i

75.     Plaintiff re-alleges and fully incorporates each of the above paragraphs as if fully stated herein.

76.     Trans Union violated 15 U.S.C. § 1681i in multiple ways, including, buy example and without limitation: by failing to delete inaccurate mixed information in the Plaintiff's credit file after receiving notice of such inaccuracies, by failing to conduct a lawful reinvestigation, by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has to know is not always reliable.

77.     Further, Trans Union violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified Trans Union directly of his dispute, that party—the consumer reporting agency who received the disputes—must investigate those disputes. The statute does not contemplate someone other than Trans Union conducting the investigation.

78.     Yet, Trans Union used an unrelated third-party, Teleperformance, over which it has claimed to have no control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Trans Union therefore violated 1681i on this basis because it sent Plaintiff's disputes away to a company that was not its controlled agent rather than investigating them as required.

79.     As a result of Trans Union's violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o or, in the alternative, his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

80.    Trans Union's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

81.    The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

WHEREFORE, Plaintiff demands judgment and compensatory and punitive damages against Defendant, TRANS UNION LLC, jointly and severally; for his attorney's fees and costs; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.


**TRIAL BY JURY IS DEMANDED.**


Respectfully submitted,

**MIGUEL GUERRERO,**

By:  _____/s/_____

Tara Keller Bar ID 22303

Leonard A. Bennett (*pro hac vice forthcoming*)
Craig C. Marchiando (*pro hac vice forthcoming*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660
(757) 930-3662 fax
craig@clalegal.com

Andrew Weiner (*pro hac vice forthcoming*)
Jeffrey B. Sand (*pro hac vice forthcoming*)
WEINER & SAND LLC
800 Battery Avenue SE
Atlanta, Georgia  30339
(404) 254-0842 (Tel.)
(404) 205-5029 (Tel.)
(866) 800-1482 (Fax)
aw@wsjustice.com
js@wsjustice.com

*Attorneys for Plaintiff*